# WATER SONG FOOD AND BEVERAGE, LLC

## Amended and Restated
## OPERATING AGREEMENT

**THIS Amended and Restated OPERATING AGREEMENT** (this "Agreement") is entered into this 10th day of July _____, 2022, by and among the undersigned members ("Members").

## EXPLANATORY STATEMENT

The parties have agreed to amend and restate in its entirety the Operating Agreement executed by the Members on April 2, 2019 to organize and operate a limited liability company in accordance with the terms of, and subject to the conditions set forth in, this Agreement.

**NOW, THEREFORE**, in consideration of the mutual promises of the parties, and for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties, intending legally to be bound, agree as follows:

## SECTION I

## DEFINED TERMS

The following capitalized terms shall have the meanings specified in this Section I. Other terms are defined in the text of this Agreement, and throughout this Agreement, those terms shall have the meanings respectively ascribed to them.

**1.1** **"Act"** means the Maryland Limited Liability Company Act, as amended from time to time.

**1.2** **"Adjusted Capital Account Deficit"** means, with respect to any Interest Holder, the deficit balance, if any, in the Interest Holder's Capital Account as of the end of the relevant taxable year, after giving effect to the following adjustments:

**1.2.1** the deficit shall be decreased by the amounts which the Interest Holder is obligated to restore pursuant to <u>Section</u> 4.4.2 or is deemed obligated to restore pursuant to Regulation Section 1.704-1(b)(2)(ii)(c); and

**1.2.2** the deficit shall be increased by the items described in Regulation Section 1.704-1(b)(2)(ii)-(d)(4), (5), and (6).

**1.3** **"Affiliate"** means, with respect to any Member, any Person: (i) which owns more than 51% of the voting interests in the Member; or (ii) in which the Member owns more than 51% of the voting interests; or (iii) in which more than 51% of the voting interests are owned by a Person who has a relationship with the Member described in clause (i) or (ii) above.

**1.4** **"Agreement"** means this Agreement, as amended from time to time.



**1.5** **"Asset Management Fee"** means the fee paid to the Founding Member for their asset management services.

**1.6** **"Capital Account"** means the account maintained by the Company for each Interest Holder in accordance with the following provisions:

**1.6.1** an Interest Holder's Capital Account shall be credited with the Interest Holder's Capital Contributions, the amount of any Company liabilities assumed by the Interest Holder (or which are secured by Company property distributed to the Interest Holder), the Interest Holder's distributive share of Profit and any item in the nature of income or gain specially allocated to such Interest Holder pursuant to the provisions of <u>Section</u> IV (other than <u>Section</u> 4.3.3); and

**1.6.2** an Interest Holder's Capital Account shall be debited with the amount of money and the fair market value of any Company property distributed to the Interest Holder, the amount of any liabilities of the Interest Holder assumed by the Company (or which are secured by property contributed by the Interest Holder to the Company), the Interest Holder's distributive share of Loss and any item in the nature of expenses or losses specially allocated to the Interest Holder pursuant to the provisions of Section IV (other than <u>Section</u> 4.3.3).

If any Interest is transferred pursuant to the terms of this Agreement, the transferee shall succeed to the Capital Account of the transferor to the extent the Capital Account is attributable to the transferred Interest. If the book value of Company property is adjusted pursuant to <u>Section</u> 4.3.3, the Capital Account of each Interest Holder shall be adjusted to reflect the aggregate adjustment in the same manner as if the Company had recognized gain or loss equal to the amount of such aggregate adjustment. It is intended that the Capital Accounts of all Interest Holders shall be maintained in compliance with the provisions of Regulation Section 1.704-1(b), and all provisions of this Agreement relating to the maintenance of Capital Accounts shall be interpreted and applied in a manner consistent with that Regulation in order to ensure that all allocations to the Members will have substantial economic effect or will otherwise be respected for federal income tax purposes.

**1.7** **"Capital Contribution"** means the total amount of cash and the fair market value of any other assets contributed (or deemed contributed under Regulation Section 1.704-1(b)(2)(iv)(d)) to the Company by a Member, net of liabilities assumed or to which the assets are subject.

**1.8** **"Cash Flow"** means all cash funds derived from operations of the Company (including interest received on reserves), without reduction for any non-cash charges, but less cash funds used to pay current operating expenses and to pay or establish reasonable reserves for future expenses, debt payments, capital improvements, and replacements as determined by the Founding Member. Cash Flow shall be increased by the reduction of any reserve previously established.

**1.9** **"Code"** means the Internal Revenue Code of 1986, as amended, or any corresponding provision of any succeeding law.

DocuSign Envelope ID: CE5F97AC-1370-4B49-9E8C-DB30CB29B99C

**1.10** "**Company**" means the limited liability company organized in accordance with this Agreement.

**1.11** "**Founding Member**" means Andrew Hinton.

**1.12** "**Interest**" means a Person's share of the Profits and Losses of, and the right to receive distributions from, the Company.

**1.13** "**Interest Holder**" means any Person who holds an Interest, whether as a Member or as an unadmitted assignee of a Member.

**1.14** "**Involuntary Withdrawal**" means, with respect to any Member, the occurrence of any of the events set forth in Section 4A-606(3) through (9) of the Act.

**1.15** "**Managing Member**" means Andrew Hinton or any of his respective successors as provided in this Agreement.

**1.16** "**Member**" means each Person signing this Agreement and any Person who subsequently is admitted as a member of the Company.

**1.17** "**Membership Rights**" means all of the rights of a Member in the Company, including a Member's: (i) Interest; (ii) right to inspect the Company's books and records; (iii) right to participate in the management of and vote on matters coming before the Company; and (iv) unless this Agreement or the Articles of Organization provide to the contrary, right to act as an agent of the Company.

**1.18** "**Minimum Gain**" has the meaning set forth in Regulation Section 1.704-2(d). Minimum Gain shall be computed separately for each Interest Holder in a manner consistent with the Regulations under Code Section 704(b).

**1.19** "**Negative Capital Account**" means a Capital Account with a balance of less than zero.

**1.20** "**Percentage**" means, as to a Member, the percentage set forth after the Member's name on Exhibit "A", as amended from time to time, and as to an Interest Holder who is not a Member, the Percentage of the Member whose Interest has been acquired by such Interest Holder, to the extent the Interest Holder has succeeded to that Member's Interest.

**1.21** "**Person**" means and includes an individual, corporation, partnership, association, limited liability company, trust, estate, or other entity.

**1.22** "**Preferred Return**" means an amount equal to 4% per annum based on the Capital Contribution of each Member, calculated annually on a cumulative basis.

**1.23** "**Positive Capital Account**" means a Capital Account with a balance greater than zero.

**1.24** "**Profit**" and "**Loss**" means, for each taxable year of the Company (or other period for which Profit or Loss must be computed) the Company's taxable income or loss determined in accordance with Code Section 703(a), with the following adjustments:

**1.24.1** all items of income, gain, loss, deduction, or credit required to be stated separately pursuant to Code Section 703(a)(1) shall be included in computing taxable income or loss;

**1.24.2** any tax-exempt income of the Company, not otherwise taken into account in computing Profit or Loss, shall be included in computing taxable income or loss;

**1.24.3** any expenditures of the Company described in Code Section 705(a)(2)(B) (or treated as such pursuant to Regulation Section 1.704-1(b)(2)(iv)(i)) and not otherwise taken into account in computing Profit or Loss, shall be subtracted from taxable income or loss;

**1.24.4** gain or loss resulting from any taxable disposition of Company property shall be computed by reference to the adjusted book value of the property disposed of, notwithstanding the fact that the adjusted book value differs from the adjusted basis of the property for federal income tax purposes;

**1.24.5** in lieu of the depreciation, amortization or cost recovery deductions allowable in computing taxable income or loss, there shall be taken into account the depreciation computed based upon the adjusted book value of the asset; and

**1.24.6** notwithstanding any other provision of this definition, any items which are specially allocated pursuant to Section 4.3 hereof shall not be taken into account in computing Profit or Loss.

**1.25** "**Regulation**" means the income tax regulations, including any temporary regulations, from time to time promulgated under the Code.

**1.26** "**SDAT**" means the State Department of Assessments and Taxation of Maryland.

**1.27** "**Transfer**" means, when used as a noun, any voluntary sale, hypothecation, pledge, assignment, attachment, or other transfer, and, when used as a verb, means voluntarily to sell, hypothecate, pledge, assign, or otherwise transfer.

**1.28** "**Voluntary Withdrawal**" means a Member's dissociation with the Company by means other than by a Transfer or an Involuntary Withdrawal.

**SECTION II**

DocuSign Envelope ID: CE5F97AC-1370-4B49-9E8C-DB30CB29B99C

## FORMATION AND NAME; OFFICE; PURPOSE; TERM

**2.1.** **Organization.** The parties hereby organize a limited liability company pursuant to the Act and the provisions of this Agreement and, for that purpose, have caused Articles of Organization to be prepared, executed and filed with the SDAT on November 19, 2018.

**2.2.** **Name of the Company.** The name of the Company shall be "Water Song Food and Beverage, LLC". The Company may do business under any other name or names upon which the Founding Member agree. If the Company does business under a name other than that set forth in its Articles of Organization, then the Company shall file a trade name certificate as required by law.

**2.3.** **Purpose.** The Company is organized to purchase acquire, own, operate, manage, or otherwise deal with restaurants, food service establishments, bars and other premises that sell food products and/or alcoholic beverages, and to lease, purchase, mortgage encumber or sell real property in connection them to, and to do any and all related activities necessary, convenient, or incidental thereto and for any other lawful purpose.

**2.4.** **Term.** The term of the Company shall begin upon the acceptance of the Articles of Organization by the SDAT and shall continue perpetually, unless its existence is terminated pursuant to Section VII of this Agreement.

**2.5.** **Principal Office.** The principal office of the Company in the State of Maryland shall be located at 6250 Old Dobbing Lane Suite 140 Columbia MD 21045, or at any other place within the State of Maryland upon which the Members may mutually agree.

**2.6.** **Resident Agent.** The name of the Company's resident agent in the State of Maryland shall be Andrew Hinton.

**2.7.** **Members.** The name, present mailing address, taxpayer identification number and Percentage of each Member are set forth on Exhibit "A". New members may be admitted to the Company upon the consent of 86% of all the Members and on such terms and conditions as shall be agreed upon by 86% of all of the Members and any new Members.

## SECTION III

## MEMBERS; CAPITAL; CAPITAL ACCOUNTS

**3.1.** **Initial Capital Contributions.** Upon the execution of this Agreement, the Members shall contribute to the Company cash in the amounts respectively set forth on Exhibit "A".

**3.2.** **No Other Capital Contributions Required.** No Member shall be required to contribute any additional capital to the Company, and except as set forth in the Act, no Member shall have any personal liability for any obligations of the Company.

**3.3.** **No Interest on Capital Contributions**. Interest Holders shall not be paid interest on their Capital Contributions.

**3.4.** **Return of Capital Contributions**. Except as otherwise provided in this Agreement, no Interest Holder shall have the right to receive the return of any Capital Contribution.

**3.5.** **Form of Return of Capital**. If an Interest Holder is entitled to receive a return of a Capital Contribution, the Company may distribute cash, notes, property, or a combination thereof to the Interest Holder in return of the Capital Contribution.

**3.6.** **Capital Accounts**. A separate Capital Account shall be maintained for each Interest Holder.

**3.7.** **Loans**. Any Member may, at any time, make or cause a loan to be made to the Company in any amount and on those terms upon which the Company and the Member agree.

## SECTION IV

## PROFIT, LOSS, AND DISTRIBUTIONS

**4.1.** **Preferred Return and Distributions of Cash Flow**. Cash Flow for each taxable year of the Company shall be distributed to the Interest Holders, to the extent the Founding Member determine, in their sole discretion, that Cash Flow is available after the Preferred Return is paid to the eligible Members.

**4.2.** **Allocation of Profit or Loss**. After giving effect to the special allocations set forth in Section 4.3, for any taxable year of the Company, Profit or Loss shall be allocated to the Interest Holders in proportion to their Percentages.

**4.3.** **Regulatory Allocations**.

**4.3.1.** **Qualified Income Offset**. No Interest Holder shall be allocated Losses or deductions if the allocation causes an Interest Holder to have an Adjusted Capital Account Deficit. If an Interest Holder receives (1) an allocation of Loss or deduction (or item thereof) or (2) any distribution which causes the Interest Holder to have an Adjusted Capital Account Deficit at the end of any taxable year, then all items of income and gain of the Company (consisting of a pro rata portion of each item of Company income, including gross income and gain) for that taxable year shall be allocated to that Interest Holder before any other allocation is made of Company items for that taxable year, in the amount and in proportions required to eliminate the excess as quickly as possible. This Section 4.3.1 is intended to comply with, and shall be interpreted consistently with, the "qualified income offset" provisions of the Regulations promulgated under Code Section 704(b).

**4.3.2.** **Minimum Gain Chargeback**. Except as set forth in Regulation Section 1.704-2(f)(2), (3), and (4), if, during any taxable year, there is a net decrease in Minimum Gain, each Interest Holder, prior to any other allocation pursuant to this Section IV, shall be specially

DocuSign Envelope ID: CE5F97AC-1370-4B49-9E8C-DB30CB29B99C

allocated items of gross income and gain for such taxable year (and, if necessary, subsequent taxable years) in an amount equal to that Interest Holder's share of the net decrease of Minimum Gain, computed in accordance with Regulation Section 1.704-2(g). Allocations of gross income and gain pursuant to this <u>Section</u> 4.3.2 shall be made first from gain recognized from the disposition of Company assets subject to nonrecourse liabilities (within the meaning of the Regulations promulgated under Code Section 752), to the extent of the Minimum Gain attributable to those assets, and thereafter, from a pro rata portion of the Company's other items of income and gain for the taxable year. It is the intent of the parties hereto that any allocation pursuant to this <u>Section</u> 4.3.2 shall constitute a "minimum gain chargeback" under Regulation Section 1.704-2(f).

      **4.3.3. Contributed Property and Book-Ups.** In accordance with Code Section 704(c) and the Regulations thereunder, as well as Regulation Section 1.704-1(b)(2)(iv)(d)(3), income, gain, loss, and deduction with respect to any property contributed (or deemed contributed) to the Company shall, solely for tax purposes, be allocated among the Interest Holders so as to take account of any variation between the adjusted basis of the property to the Company for federal income tax purposes and its fair market value at the date of contribution (or deemed contribution). If the adjusted book value of any Company asset is adjusted as provided herein, subsequent allocations of income, gain, loss, and deduction with respect to the asset shall take account of any variation between the adjusted basis of the asset for federal income tax purposes and its adjusted book value in the manner required under Code Section 704(c) and the Regulations thereunder.

      **4.4. Liquidation and Dissolution.**

      **4.4.1.** If the Company is liquidated, the assets of the Company shall be distributed to the Interest Holders in accordance with the balances in their respective Capital Accounts, after taking into account the allocations of Profit or Loss pursuant to <u>Section</u> 4.2, if any, and distributions, if any, of cash or property, pursuant to <u>Section</u> 4.1.

      **4.4.2.** No Interest Holder shall be obligated to restore a Negative Capital Account.

      **4.5. General.**

      **4.5.1.** Except as otherwise provided in this Agreement, the timing and amount of all distributions shall be determined by the Founding Member.

      **4.5.2.** If any assets of the Company are distributed in kind to the Interest Holders, those assets shall be valued on the basis of their fair market value, and any Interest Holder entitled to any interest in those assets shall receive that interest as a tenant-in-common with all other Interest Holders so entitled. Unless the Members otherwise agree, the fair market value of the assets shall be determined by an independent appraiser who shall be selected by the Members. The Profit or Loss for each unsold asset shall be determined as if the asset had been sold at its fair market value, and the Profit or Loss shall be allocated as provided in <u>Section</u> 4.2 and shall be properly credited or charged to the Capital Accounts of the Interest Holders prior to the distribution of the assets in liquidation pursuant to <u>Section</u> 4.4.

**4.5.3.** All Profit and Loss shall be allocated, and all distributions shall be made, to the Persons shown on the records of the Company to have been Interest Holders as of the last day of the taxable year for which the allocation or distribution is to be made. Notwithstanding the foregoing, unless the Company's taxable year is separated into segments, if there is a Transfer or an Involuntary Withdrawal during the taxable year, the Profit or Loss shall be allocated between the original Interest Holder and the successor on the basis of the number of days each was an Interest Holder during the taxable year; provided, however, the Company's taxable year shall be segregated into two or more segments in order to account for Profit, Loss, or proceeds attributable to any extraordinary non-recurring items of the Company.

**4.5.4.** The Members are hereby authorized, upon the advice of the Company's tax counsel or accountant, to amend this Article IV to comply with the Code and the Regulations promulgated under Code Section 704(b); provided, however, that no amendment shall materially affect distributions to an Interest Holder without the Interest Holder's prior written consent.

## SECTION V

## MANAGEMENT: RIGHTS, POWERS, AND DUTIES

**5.1.  Management.**

**5.1.1.  Managing Member.**  The Company shall be managed by the Managing Member.  In the event that a Managing Member is no longer a Member or a Managing Member becomes disabled or dies, the Members shall select a new Managing Member by majority vote.

**5.1.2. General Powers of Managing Members.**  The Managing Member shall have full, exclusive, and complete discretion, power, and authority, subject in all cases to the requirements of applicable law, to manage, control, administer, and operate the business and affairs of the Company and to make all decisions affecting such business and affairs and to execute and deliver all documents and instruments necessary to carry on the business and affairs of the Company, subject only to Section 5.1.3. All major actions of the Company as set forth in Section 5.1.3 shall require the joint consent of the Founding Member; provided, however, that the foregoing shall not prohibit the Managing Member from executing documents or otherwise taking certain specified actions on behalf of the Company.

**5.1.3. Items Requiring Consent of Founding Member.**  Notwithstanding any provision of law permitting or requiring any action to be taken or approved by the affirmative vote of the members entitled to cast a lesser number of votes, or permitting any action to be taken or approved without the consent of the Founding Member, the following decisions and actions will require the affirmative vote of the Founding Member or their assignees:

(i) file or consent to the filing of any bankruptcy, insolvency or reorganization case or proceeding, institute any proceedings under any applicable insolvency law or otherwise seek any relief under any laws relating to the relief from debts or the protection of debtors generally; seek or consent to the appointment of a receiver, liquidator, assignee, trustee, sequestrator, custodian or any similar official for the Company or a substantial portion of its

properties; make any assignment for the benefit of the Company's creditors; or take any action in furtherance of any of the foregoing;

(ii) admit new members or raise capital or equity;

(iii) amend, alter or replace the Articles of Organization or this Operating Agreement;

(iv) issue membership interest or any other securities exchangeable for, or convertible into such membership interests, or warrants or other instruments evidencing rights or options to subscribe for, or otherwise acquire such interests;

(v) merge, sell, consolidate the Company or sell or transfer all or substantially all of the assets of the Company;

(vi) dissolve the Company;

(vii) incur or assume any indebtedness in an amount in excess of Five Thousand Dollars ($5,000.00) or guaranty any Company debt; or

(viii) purchase, lease or otherwise acquire any property, real or personal or make any capital expenditure in excess of Five Thousand Dollars ($5,000.00).

**5.1.4. Limitation on Authority of Members**.

5.1.4.1. No Member is an agent of the Company solely by virtue of being a Member, and no Member has authority to act for the Company solely by virtue of being a Member.

5.1.4.2. This Section 5.1.4 supersedes any authority granted to the Members pursuant to Section 4A-401 of the Act. Any Member who takes any action or binds the Company in violation of this Section 5.1 shall be solely responsible for any loss and expense incurred by the Company as a result of the unauthorized action and shall indemnify and hold the Company harmless with respect to the loss or expense.

**5.1.5. Removal of Managing Members**. If any one or more of the following events occurs, the Members may remove the Managing Member and, subject to the terms hereof, elect a Successor Managing Member.

5.1.5.1. The Managing Member's willful or intentional violation or reckless disregard of the Managing Member's duties to the Company as determined by the majority of the other Members;

5.1.5.2. The Managing Member's Involuntary Withdrawal; or

5.1.5.3. The vote of 75% of the interest of the Members.

**5.2.** **Meetings of and Voting by Members**.

**5.2.1.** A meeting of the Members may be called at any time by the Founding Member. Meetings of Members shall be held at the Company's principal place of business or at any other place in Baltimore, Maryland designated by the Member calling the meeting. Not less than ten (10) nor more than ninety (90) days before each meeting, the Member calling the meeting shall give written notice of the meeting to each Member. The notice shall state the time, place, and purpose of the meeting. Notwithstanding the foregoing provisions, each Member waives notice if before or after the meeting the Member signs a waiver of the notice which is filed with the records of Members' meetings, or is present at the meeting in person or by proxy (for any purpose other than to contest the proceedings). Unless this Agreement provides otherwise, at a meeting of Members, the presence in person, by proxy of Members holding not less than fifty-one percent (51%) of the Percentages then held by Members constitutes a quorum. A Member may vote either in person or by written proxy signed by the Member or by the Member's duly authorized attorney in fact. A Member shall be deemed present at a meeting if such presence is by telephone conference.

**5.2.2** Except as otherwise provided in this Agreement, the affirmative vote of the Members holding fifty-one percent (51%) or more of the Percentages then held by Members shall be required to approve any matter coming before the Members.

**5.2.3** In lieu of holding a meeting, the Members may vote or otherwise take action by a written instrument indicating the consent of the Members necessary to approve such action. Upon the taking of any such vote or other action, the Members not consenting thereto shall be provided with a copy of such written instrument.

**5.3.** **Asset Management Fee**. Unless otherwise set forth in this Agreement, no Member shall be required to perform services for the Company solely by virtue of being a Member. The Founding Member shall be entitled to reimbursement for expenses reasonably incurred in connection with the activities of the Company. Notwithstanding anything in the foregoing to the contrary, the Company intends pay the Founding Member an Asset Management Fee as determined by the Managing Member in his sole discretion. The Asset Management Fee at the effective date of this Agreement shall be 2% of the Capital Accounts of all Interest Holders, split evenly between the Founding Member and paid quarterly to the Founding Member.

**5.4.** **Duties of Parties**.

**5.4.1.** The Managing Member shall devote such time to the business and affairs of the Company as is necessary to carry out the Managing Member's duties set forth in this Agreement.

**5.4.2.** Except as otherwise expressly provided in <u>Section</u> 5.4.3., to the terms of any separate employment agreements with the Company, nothing in this Agreement shall be deemed to restrict in any way the rights of any Member, or of any Affiliate of any Member, to conduct any other business or activity whatsoever, and no Member shall be accountable to the Company or to any other Member with respect to that business or activity even if the business or activity competes with the Company's business. The organization of the Company shall be

DocuSign Envelope ID: CE5F97AC-1370-4B49-9E8C-DB30CB29B99C

without prejudice to the Members' respective rights (or the rights of their respective Affiliates) to maintain, expand, or diversify such other interests and activities and to receive and enjoy profits or compensation therefrom. Each Member waives any rights the Member might otherwise have to share or participate in such other interests or activities of any other Member or the Member's Affiliates.

**5.4.3.** Each Member understands and acknowledges that the conduct of the Company's business may involve business dealings and undertakings with the Founding Member and their Affiliates. In any of those cases, those dealings and undertakings shall be at arm's length and on commercially reasonable terms.

**5.5. Liability and Indemnification.**

**5.5.1.** The Founding Member shall not be liable, responsible, or accountable, in damages or otherwise, to any other Member or to the Company for any act performed by the Founding Member with respect to Company matters, except for fraud, gross negligence, or an intentional breach of this Agreement.

**5.5.2.** The Company shall indemnify the Founding Member for any act performed by the Founding Member with respect to Company matters, except for fraud, gross negligence, or an intentional breach of this Agreement.

## SECTION VI

## TRANSFER OF INTERESTS AND WITHDRAWALS OF MEMBERS

**6.1. Transfers.** Subject to the provisions of this Section 6, a Member may, at any time and from time to time, transfer all, or any portion of, or any interest or rights in, the Membership Rights owned by the Member; upon a transfer of the Member's Membership Rights, the transferee shall automatically be admitted to the Company as a Member, provided that the transferee executes and delivers to the Company a counterpart of this Agreement. Notwithstanding anything herein to the contrary, all Members other than the Founding Member must receive the prior written consent of the Founding Member to Transfer Interest in the Company.

**6.2. Right of First Refusal.**

**6.2.1** If a Member (individually, a "Transferor") receives a bona fide written offer which the Member desires to accept (the "Transferee Offer") from any other Person (a "Transferee") to purchase all or any portion of or any interest or rights in the Transferor's Membership Rights (the "Transferor Interest") then, prior to any Transfer of the Transferor Interest, the Transferor shall give the Company written notice (the "Transfer Notice") containing each of the following:

**6.2.1.1** the Transferee's identity;

**6.2.1.2** a true and complete copy of the Transferee Offer; and

11

**6.2.1.3** the Transferor's offer (the "Offer") to sell the Transferor Interest to the Company for a price (the "Transfer Purchase Price") equal to the lower of (i) the book value of the Transferor Interest (as determined by the certified public accountant regularly employed by the Company), but not less than the original capital contributed by the Transferor plus 6% interest per annum from the date of contribution for the Transferor Interest ("Book Value"), or (ii) the price contained in the Transferee Offer and upon the payment terms contained therein.

**6.2.2.** The Offer shall be and remain irrevocable for a period (the "Offer Period") ending at 11:59 P.M., local time at the Company's principal office, on the thirtieth (30th) day following the date the Transfer Notice is given to the Company. At any time during the Offer Period, the Company may accept the Offer by giving written notice to the Transferor of its acceptance (the "Offeree Notice"). The Transferor shall not be deemed a Member for the purpose of the vote on whether the Company shall accept the Offer; acceptance by the Company shall be upon the vote of the other Members holding fifty-one percent (51%) of the Percentages held by the other Members. If the Company accepts the Offer, the Offeree Notice shall fix a closing date (the "Transfer Closing Date") for the purchase, which shall not be earlier than ten (10), or more than ninety (90), days after the expiration of the Offer Period.

**6.2.3.** If the Company accepts the offer, the Transfer Purchase Price shall be paid on an installment basis by the Company executing and delivering its unsecured promissory note equal to the Transfer Purchase Price, which note shall provide for equal monthly combined payments of principal and interest over a five (5) year term, with interest at seven percent (7%) per annum. Simultaneously with the Transfer Closing Date, the Transferor shall execute, under seal, and deliver to the Company those assignments and other instruments as may be reasonably required to vest in the Company, all right, title, and interest in and to the Transferor Interest, free and clear of all liens and encumbrances. The Company may prepay in full or in part, any amount due under the Note, without penalty.

Notwithstanding anything in the foregoing to the contrary, payments under the note and interest under the note shall commence only upon the elimination of any indebtedness other than arising from this Section 6 from the Company to any Member ("Member Indebtedness"), or any refinancing indebtedness which eliminates the Member indebtedness.

**6.2.4.** If the Company rejects the Offer or fails to accept the Offer (within the time and in the manner specified in this Section), then the Transferor shall be free for a period (the "Free Transfer Period") of thirty (30) days after the expiration of the Offer Period to Transfer the Transferor Interest to the Transferee, for the same or greater price and on the same terms and conditions as set forth in the Transfer Notice. If the Transferor does not Transfer the Transferor Interest within the Free Transfer Period, the Transferor's right to Transfer the Transferor Interest pursuant to this Section shall cease and terminate.

**6.2.5.** Any Transfer by the Transferor after the last day of the Free Transfer Period or without strict compliance with the terms, provisions, and conditions of this Section and the other terms, provisions, and conditions of this Agreement, shall be null and void and of no force or effect.

**6.2.6.** Sections 6.2.1-6.2.5 and 6.4 shall not apply to the Founding Member. Each Founding Member may Transfer his Interest freely upon the approval of the other Founding Member at an agreed upon price, except as set forth in Section 6.6.

**6.3.**    **Voluntary Withdrawal.** No Member shall have the right or power to Voluntarily Withdraw from the Company except the Founding Member.

**6.4.**    **Optional Buy-out in Event of Involuntary Withdrawal other than Due to Death or Permanent Disability.**

**6.4.1.** In the event of an Involuntary Withdrawal other than due to death or permanent disability of any Member, such withdrawn Member shall be deemed to offer for sale (the "Withdrawal Offer") to the Company all of the Membership Rights owned of record and beneficially by the withdrawn Member (the "Withdrawal Interest).

**6.4.2.** The Withdrawal Offer shall be and remain irrevocable for a period (the "Withdrawal Offer Period") ending at 11:59 P.M., local time at the Company's principal office on the sixtieth (60th) day following the date the event of Involuntary Withdrawal occurred. At any time during the Withdrawal Offer Period, the Company may accept the Withdrawal Offer by notifying the withdrawn Member (the "Withdrawal Notice") of its acceptance. The withdrawn Member shall not be deemed a Member for the purpose of the vote on whether the Company shall accept the Withdrawal Offer; acceptance by the Company shall be upon the vote of the other Members holding fifty-one percent (51%) of the Percentages of the other Members.

**6.4.3.** If the Company accepts the Withdrawal Offer, the Withdrawal Notice shall fix a closing date (the "Withdrawal Closing Date") for the purchase which shall be not earlier than ten (10) or later than ninety (90) days after the expiration of the Withdrawal Offer Period.

**6.4.4.** If the Company accepts the Withdrawal Offer, the Company shall purchase the Withdrawal Interest for a price equal to the Book Value (the "Withdrawal Purchase Price"). The Withdrawal Purchase Price shall be paid on an installment basis by the Company executing and delivering its unsecured promissory note equal to the Withdrawal Purchase Price, which note shall provide for equal monthly combined payments of principal and interest over a five (5) year term, with interest at seven percent (7%) per annum. Simultaneously with the Withdrawal Closing Date, the Withdrawn Member shall execute, under seal, and deliver to the Company those assignments and other instruments as may be reasonably required to vest in the Company, all right, title, and interest in and to the Withdrawal Interest, free and clear of all liens and encumbrances. The Company may prepay in full or in part, any amount due under the Note, without penalty.

Notwithstanding anything in the foregoing to the contrary, payments under the note and interest under the note shall commence only upon the elimination of any indebtedness from the Member Indebtedness or any refinancing indebtedness which eliminates the Member indebtedness.

**6.4.5.** If the Company fails to accept the Withdrawal Offer, then the withdrawn Member or the withdrawn Member's successor, as the case may be, upon the expiration of the Withdrawal Offer Period, thereafter shall be treated as the unadmitted assignee of a Member.

**6.5.** **Fair Market Value.** The term "Fair Market Value" means the amount that would be received for the interest being valued, based upon the fair market value of the transferring Member's interest as determined by the certified public accountant regularly employed by the Company. The determination by the certified public accountant regularly employed by the Company shall be final and non-appealable.

**6.6.** **Mandatory Buy-out in Event of Death or Permanent Disability**

**6.6.1.** If the Members elect to continue the Company after the death or permanent disability of a Founding Member (the "Deceased/Disabled Founding Member"), the Company shall purchase, and the representatives of the Deceased/Disabled Founding Member shall sell, all of the Membership Rights owned of record and beneficially by the Deceased/Disabled Founding Member (the "Deceased/Disabled Interest") for a price equal to the Fair Market Value. As used in this Agreement, "permanent disability" shall mean the inability of the Founding Member to perform his regular full time duties pursuant to his employment agreement with the Company, or other full time employment if not employed by the Company, for 210 consecutive days or 180 days out of any 210 day period; if not employed, a statement from a an attending physician of total disability as to employment.

**6.6.2.** The Company, by written notice addressed to the representatives of the Deceased/Disabled Founding Member, shall fix a closing date (the "Closing Date") for the purchase.

The Closing Date shall not be earlier than ten (10) days or later than one hundred fifty (150) days after the later of the date on which the Deceased/Disabled Member became deceased or permanently disabled.

**6.6.3.** The Deceased/Disabled Purchase Price shall be paid on an installment basis by the Company executing and delivering its unsecured promissory note equal to the Deceased/Disabled Purchase Price to the representative of the Deceased/Disabled Founding Member, which note shall provide for equal monthly combined payments of principal and interest over a five (5) year term, with interest at seven percent (7%) per annum. Simultaneously with the payment of the Deceased/Disabled Purchase Price, the representatives of the Deceased/Disabled Founding Member shall execute, under seal, and deliver to the Company those assignments and other instruments as may be reasonably required to vest in the Company, all right, title, and interest in and to the Deceased/Disabled Interest, free and clear of all liens and encumbrances. The Company may prepay in full or in party, any amount due under the Note, without penalty. Notwithstanding anything in the foregoing to the contrary, the Company shall, in the event of death for which the Company holds a life insurance policy on the life of the Deceased/Disabled Founding Member, pay the Deceased/Disabled Purchase Price by the amount of such insurance proceeds received (but in no event greater than the Deceased/Disabled Purchase Price, with any excess insurance proceeds to be the property of the Company), with the balance thereof, if any, to be paid in installments as hereinabove provided.

14

DocuSign Envelope ID: CE5F97AC-1370-4B49-9E8C-DB30CB29B99C

**6.6.4.** The Company, at its option, may obtain insurance policies as to death and/or disability, on any Founding Member to fund the buy-out set forth in this Section 6.6; provided, however, that the Company shall pay the purchase price on an installment basis as herein provided, unless it determines otherwise, at its discretion, notwithstanding the receipt of any insurance proceeds.

**6.6.5.** Notwithstanding anything in the foregoing to the contrary, payments under the note and interest under the note shall commence only upon the elimination of any indebtedness from the Member Indebtedness or any refinancing indebtedness which eliminates the Member Indebtedness.

**6.6.6.** After the death or disability of any Member who is not a Founding Member (and in the event of a Voluntary Withdrawal, Involuntary Withdrawal, or any other Transfer of a non-Founding Member's Interest, if the price is not otherwise set forth herein), the Company shall purchase, and the Member or the representatives of the Member shall sell, all of the Membership Rights owned of record and beneficially by such Member for a price equal to the price paid by the Member for the Interest.

**SECTION VII**

**DISSOLUTION, LIQUIDATION, AND
TERMINATION OF THE COMPANY**

**7.1.** **Events of Dissolution**. The Company shall be dissolved upon the happening of any of the following events:

**7.1.1.** upon the unanimous written agreement of the Members; or

**7.1.2.** at the time of the entry of a decree of judicial dissolution under Section 4A-093 of the Act.

**7.2.** **Procedure for Winding Up and Dissolution**. If the Company is dissolved, the remaining Members shall wind up its affairs. On winding up of the Company, the assets of the Company shall be distributed, first, to creditors of the Company, including Interest Holders who are creditors, in satisfaction of the liabilities of the Company, and then to the Interest Holders in accordance with Section 4.4. of this Agreement.

**7.3.** **Filing of Articles of Cancellation**. If the Company is dissolved, the Members shall promptly file Articles of Cancellation with SDAT. If there are no remaining Members, the Articles shall be filed by the last Person to be a Member; if there are no remaining Members, or a Person who last was a Member, the Articles shall be filed by the legal or personal representatives of the Person who last was a Member.

**SECTION VIII**

**BOOKS, RECORDS, ACCOUNTING, AND TAX ELECTIONS**

DocuSign Envelope ID: CE5F97AC-1370-4B49-9E8C-DB30CB29B99C

**8.1. Bank Accounts.** All funds of the Company shall be deposited in a bank account or accounts opened in the Company's name. The Founding Member shall determine the institution or institutions at which the accounts will be opened and maintained, the types of accounts, and the Persons who will have authority with respect to the accounts and the funds therein.

**8.2. Books and Records.** The Members shall keep or cause to be kept complete and accurate books and records of the Company and supporting documentation of the transactions with respect to the conduct of the Company's business. The books and records shall be maintained in accordance with sound accounting principles and practices and shall be available at the Company's principal office for examination by any Member or the Member's duly authorized representative at any and all reasonable times during normal business hours.

**8.3. Annual Accounting Period.** The annual accounting period of the Company shall be its taxable year. The Company's taxable year shall be selected by the Members, subject to the requirements and limitations of the Code.

**8.4. Reports.** Within seventy-five (75) days after the end of each taxable year of the Company, the Managing Member shall cause to be sent to each Person who was a Member at any time during the taxable year then ended a complete accounting of the affairs of the Company for the taxable year then ended. In addition, within seventy-five (75) days after the end of each taxable year of the Company, the Members shall cause to be sent to each Person who was an Interest Holder at any time during the taxable year then ended, that tax information concerning the Company which is necessary for preparing the Interest Holder's income tax returns for that year. At the request of any Member, and at the Member's expense, the Members shall cause an audit of the Company's books and records to be prepared by independent accountants for the period requested by the Member.

**8.5. Partnership Representative.** The Founding Member shall designate a "partnership representative" (the "Partnership Representative") of the Company in accordance with the Bipartisan Budget Act of 2015 and the associated sections of the Internal Revenue Code ("Code") and Treasury Regulations ("Regulations") (collectively, the "BBA"). The Partnership Representative shall initially be the Managing Member. The Partnership Representative may be removed, and a new Partnership Representative appointed, by the Members, in accordance with the BBA.

The Partnership Representative is authorized to take such actions and to execute and file all statements and forms on behalf of the Company, which may be permitted or required by the BBA, including an election under Code Section 6221 (b) (opt-out election). The Partnership Representative shall have full and exclusive power and authority on behalf of the Company to represent the Company (at the Company's expense) in connection with all audits and examinations of the Company's affairs by tax authorities, which may be permitted or required by the BBA. Such power and authority shall include, without limitation the power and authority to cause the Company to elect under Code Section 6226 to allocate the adjustment to the Members (push-out election).

16

DocuSign Envelope ID: CE5F97AC-1370-4B49-9E8C-DB30CB29B99C

Each Member hereby agrees to indemnify and hold harmless the Company from and against any liability with respect to its share of any tax deficiency paid or payable by the Company that is allocable to the Member (as reasonably determined by the Partnership Representative) with respect to an audited or reviewed taxable year for which such Member was a Member (for the avoidance of doubt, including any applicable interest and penalties). No Member shall indirectly bear through its economic interest in the Company any tax deficiency paid or payable by the Company in excess of the portion allocable to such Member (as reasonably determined by Partnership Representative) with respect to an audited or reviewed taxable year for which such Member was a Member (for the avoidance of doubt, including any applicable interest and penalties). The obligations set forth in this Section will survive such Member ceasing to be a Member of the Company and/or the termination, dissolution, liquidation, and winding up of the Company.

## SECTION IX

## GENERAL PROVISIONS

**9.1.    Assurances**.    Each Member shall execute all such certificates and other documents and shall do all such filing, recording, publishing, and other acts as the Members deem appropriate to comply with the requirements of law for the formation and operation of the Company and to comply with any laws, rules, and regulations relating to the acquisition, operation, or holding of the property of the Company.

**9.2.    Notifications**.  Any notice, demand, consent, election, offer, approval, request, or other communication (collectively, a "notice") required or permitted under this Agreement must be in writing and either delivered personally or sent by certified or registered mail, postage prepaid, return receipt requested.  A notice must be addressed to an Interest Holder at the Interest Holder's last known address on the records of the Company.  A notice to the Company must be addressed to the Company's principal office.  A notice delivered personally will be deemed given only when acknowledged in writing by the person to whom it is delivered.  A notice that is sent by mail will be deemed given three (3) business days after it is mailed.  Any party may designate, by notice to all of the others, substitute addresses or addressees for notices; and, thereafter, notices are to be directed to those substitute addresses or addressees.

**9.3.    Specific Performance**.  The parties recognize that irreparable injury will result from a breach of any provision of this Agreement and that money damages will be inadequate to remedy fully the injury.  Accordingly, in the event of a breach or threatened breach of one or more of the provisions of this Agreement, any party who may be injured (in addition to any other remedies which may be available to that party) shall be entitled to one or more preliminary or permanent orders (i) restraining and enjoining any act which would constitute a breach or (ii) compelling the performance of any obligation which, if not performed, would constitute a breach.

**9.4.    Complete Agreement**.  This Agreement constitutes the complete and exclusive statement of the agreement among the Members.  It supersedes all prior written and oral statements, including any prior representation, statement, condition, or warranty.  Except as

expressly provided otherwise herein, this Agreement may not be amended without the written consent of all of the Members.

**9.5. Applicable Law.** All questions concerning the construction, validity, and interpretation of this Agreement and the performance of the obligations imposed by this Agreement shall be governed by the internal law, not the law of conflicts, of the State of Maryland.

**9.6. Section Titles.** The headings herein are inserted as a matter of convenience only, and do not define, limit, or describe the scope of this Agreement or the intent of the provisions hereof.

**9.7. Binding Provisions.** This Agreement is binding upon, and inures to the benefit of, the parties hereto and their respective heirs, executors, administrators, personal and legal representatives, successors, and permitted assigns.

**9.8. Jurisdiction and Venue.** Any suit involving any dispute or matter arising under this Agreement may only be brought in the United States District Court for the District of Maryland or any Maryland State Court having jurisdiction over the subject matter of the dispute or matter. All Members hereby consent to the exercise of personal jurisdiction by any such court with respect to any such proceeding.

**9.9. Terms.** Common nouns and pronouns shall be deemed to refer to the masculine, feminine, neuter, singular and plural, as the identity of the Person may in the context require.

**9.10. Separability of Provisions.** Each provision of this Agreement shall be considered separable; and if, for any reason, any provision or provisions herein are determined to be invalid and contrary to any existing or future law, such invalidity shall not impair the operation of or affect those portions of this Agreement which are valid.

**9.11. Counterparts.** This Agreement may be executed simultaneously in two or more counterparts each of which shall be deemed an original, and all of which, when taken together, constitute one and the same document. The signature of any party to any counterpart shall be deemed a signature to, and may be appended to, any other counterpart.

**9.12. Calculations.** Any calculations or determinations or purchase prices required under this Agreement shall be accomplished by the Company's regularly employed accountants and shall be determinative.

[Remainder of page intentionally left blank]

DocuSign Envelope ID: CE5F97AC-1370-4B49-9E8C-DB30CB29B99C

IN WITNESS WHEREOF, the parties have executed, or caused this Agreement to be executed, under seal, as of the date set forth hereinabove.

WITNESS:

MEMBERS:

_____(SEAL)

Andrew Hinton, Managing Member

_____(SEAL)

Kun Chen

_____(SEAL)

Shiqi Zhou

_____(SEAL)

Zifei Zhao

_____(SEAL)

Yijia Zhao

_____(SEAL)

Shang Liu

_____(SEAL)

Wen Lin

_____(SEAL)

Michael Turner

_____(SEAL)

Yu Dai

Trevor Heburn

19

Bo Yang

WITNESS:

*Andrew Hinton* (SEAL)

*Andrew Hinton* (SEAL)

*Andrew Hinton* (SEAL)

_____ (SEAL)

_____ (SEAL)

_____ (SEAL)

_____ (SEAL)

MEMBERS:

*Xiaoyu Liu*
Xiaoyu Liu

*Yufeng Guan*
Yufeng Guan

*Xinyi Liu*

_____

_____

_____

_____